## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## SAN ANGELO DIVISION

| | |
|---|---|
| **POLYLAST SYSTEMS, LLC** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 6:25-CV-040-H** |
| **HAYWARD BROS INC., LOUIE HAYWARD aka LOUIS HAYWARD, DEBORAH CORNELL aka DEBORAH HAYWARD, CAMELLIA BOUTIQUE, LLC, and ASHTIN BURKEY** | |
| **Defendants.** | |

### PLAINTIFF POLYLAST SYSTEMS, LLC'S OPENING CLAIM-CONSTRUCTION BRIEF

### I. Introduction

Plaintiff Polylast Systems, LLC ("Polylast") submits this opening claim-construction brief pursuant to the Court's Scheduling Order (Dkt. No. 45). This action arises from Defendants' infringement of Polylast's patented rubber flooring and bunker liner technologies, as claimed in U.S. Patent No. 10,309,070 (the "'070 Patent") and U.S. Patent No. 9,982,143 (the "'143 Patent"). These patents address long-standing problems in the design and performance of resilient rubber surfacing and liner systems, including durability, structural integrity, liquid flow-through rates, biosecurity and sanitation, performance under stress, and resistance to degradation over time. The asserted claims cover systems defined by their structural configuration and functional performance once deployed or installed, regardless of whether individual components are formed in situ, pre-manufactured, or implemented through a combination of approaches, except where a claim expressly provides otherwise. Proper construction of the asserted claims is

therefore essential to defining the scope of the patented inventions and to resolving the parties' infringement and validity disputes.

Claim construction is required to provide a clear and consistent framework for evaluating whether Defendants' accused products fall within the scope of the asserted claims. Although Defendants have asserted that no claim construction is necessary, have declined to propose any constructions of their own, and have failed to respond to Polylast's claim constructions, that position does not eliminate genuine disputes regarding claim scope. The asserted patents involve specialized rubber-based systems with defined structural and functional relationships, and the meaning of key claim terms cannot be determined in the abstract. As the Federal Circuit has repeatedly held, assertions that claim terms should be given their "plain and ordinary meaning," without analysis grounded in the intrinsic record, do not relieve the Court of its obligation to construe disputed terms as a matter of law. Claim construction at this stage is necessary to ensure that the scope of the asserted claims is defined by the patent record itself, providing fair notice and predictability as the case proceeds. Resolving claim scope now ensures that infringement and validity issues are evaluated on a stable legal foundation, rather than through merits arguments untethered from the claims themselves.

The need for careful claim construction is particularly acute here because Defendants have taken the position that they do not make infringing products at all, while simultaneously refusing to engage in any substantive claim-construction analysis. Defendants' blanket denial of infringement does not resolve the meaning or scope of the asserted claim terms, and their refusal to propose constructions leaves unresolved disputes that only the Court can address. Claim construction is therefore necessary to define the scope of the '070 and '143 Patents and to provide a stable framework for evaluating infringement and validity. Proper construction must be

grounded in the claim language and the intrinsic record, rather than left to undefined assertions of non-infringement untethered from the claims themselves.

Polylast has complied in good faith with the Local Patent Rules. It identified the claim terms that require construction and proposed constructions grounded firmly in the intrinsic record. Those constructions reflect how a person of ordinary skill in the art would have understood the claims at the time of the invention, based on the claim language, the written descriptions, and the prosecution histories of the '070 and '143 Patents. Polylast's constructions are not litigation-driven interpretations crafted for expedience. They instead reflect the scope the patentee chose to claim, consistent with the technological problems addressed and the solutions disclosed.

Importantly, Polylast's proposed constructions do not improperly import limitations from preferred embodiments or illustrative examples described in the specifications. The '070 and '143 Patents describe rubber flooring and bunker liner systems defined by specific structural and functional relationships recited in the claims, and the intrinsic record does not support narrowing those claims to particular embodiments, fabrication methods, or modes of implementation absent a clear and unmistakable disclaimer. Proper claim construction must therefore give effect to the full scope of the claim language as understood by a person of ordinary skill in the art, rather than imposing restrictions drawn from exemplary descriptions or selective features. Where the asserted claims are satisfied, variations in how individual components are formed, supplied, or installed do not remove an accused product from the scope of the claims as properly construed.

Early and principled claim construction will also promote fairness and judicial efficiency by ensuring that the parties litigate this case on a shared and stable understanding of claim scope. Claim construction provides the framework through which both infringement and validity must

3

be evaluated, and the same constructions apply to each. Those constructions must therefore be grounded in the intrinsic record, rather than shaped by shifting interpretations or case-specific outcomes. Adoption of Polylast's proposed constructions will provide the clarity necessary for the Court to assess the merits of the parties' positions on a consistent and legally sound foundation.

Defendants were afforded the opportunity to participate in the claim-construction process but declined to do so. As a result, Polylast has proceeded in accordance with the Patent Rules by providing proposed constructions grounded in the intrinsic record. Where a party elects not to advance competing constructions or engage in the claim-construction process, courts routinely resolve claim scope based on the constructions properly presented, rather than permitting belated or shifting interpretations later in the case. Allowing Defendants to introduce new claim-construction positions after declining to participate would undermine the purpose of early claim construction and prejudice the orderly resolution of the case.

This brief reflects Polylast's current claim-construction positions based on the claim language and intrinsic record.

For these reasons, the Court should adopt the claim constructions proposed by Polylast. Those constructions are faithful to the intrinsic evidence, consistent with governing Federal Circuit precedent, and necessary to resolve the parties' dispute concerning Defendants' accused rubber flooring and bunker liner products.

## II. PROCEDURAL BACKGROUND AND CLAIM-CONSTRUCTION POSTURE

Polylast has complied in good faith with the claim-construction procedures set forth in the Local Patent Rules and the Court's Scheduling Order. In accordance with those requirements, Polylast identified asserted claims and claim terms requiring construction, served its Preliminary

Claim Construction disclosures, and provided proposed constructions supported by the intrinsic record.

Defendants were afforded the same opportunity to participate in claim construction but elected not to do so. They did not propose constructions for any disputed claim term, did not substantively respond to Polylast's proposed constructions, and instead asserted that claim construction was unnecessary. Defendants' position does not resolve the parties' disagreement regarding claim scope and does not obviate the Court's obligation to construe disputed claim terms as a matter of law.

Defendants have asserted that they do not make infringing products, yet have refused to articulate any claim constructions explaining why their products fall outside the asserted claims. Such product-specific denials do not substitute for claim construction and do not resolve the meaning or scope of the asserted claim terms. Whether an accused product falls within the scope of the claims can only be evaluated after the Court determines what the claims mean as a matter of law. Product-specific denials of infringement, untethered from articulated claim constructions grounded in the intrinsic record, cannot eliminate the need for claim construction and are procedurally improper at this stage.

The Local Patent Rules require parties to disclose and crystallize their claim-scope positions early in the case. A party may not avoid that obligation by asserting that no construction is necessary while simultaneously advancing product-specific non-infringement positions. Such an approach deprives the Court and the opposing party of fair notice of the claim scope theories being asserted and undermines the purpose of early claim construction.

The claim-construction procedures required by the Local Patent Rules are not optional formalities. They are intended to force parties to articulate their claim-scope positions early, so

that disputes are defined by reference to the patent record rather than developed piecemeal through later motion practice or discovery. By declining to propose any constructions or respond substantively to Polylast's constructions, Defendants have left the scope of their non-infringement position undefined, reinforcing the need for the Court's intervention to construe the disputed terms.

The Local Patent Rules are designed to narrow and crystallize claim-scope disputes early in the case, providing clarity and efficiency as the litigation proceeds. Where, as here, one party elects not to advance competing constructions or engage in the claim-construction process, courts routinely proceed based on the constructions properly presented, rather than permitting a party to reserve claim-scope arguments for later stages of the litigation. Allowing a party to introduce new or shifting claim-construction positions after declining to participate would undermine the purpose of early claim construction and disrupt the orderly resolution of the case.

Early claim construction also serves a critical fairness function by providing both parties with clear notice of claim scope before the case advances into merits discovery and dispositive motion practice. Where a party declines to engage in claim construction, allowing that party to later advance claim-scope arguments would create uncertainty, invite strategic gamesmanship, and undermine the predictability that the Patent Rules are designed to ensure. Proceeding now on properly supported constructions avoids those risks and preserves the integrity of the claim-construction process.

Accordingly, Polylast has proceeded as required by the Patent Rules by presenting proposed constructions grounded in the intrinsic record. Those constructions reflect how a person of ordinary skill in the art would have understood the claims at the time of the invention,

based on the claim language, the written descriptions, and the prosecution histories of the '070 and '143 Patents.

The Court already has before it a sufficient record on which to construe the disputed claim terms. Polylast's proposed constructions are presented in the manner contemplated by the Local Patent Rules and are supported by the intrinsic evidence that governs claim construction as a matter of law. No additional factual development is required to construe the claims, and Defendants' decision not to present competing constructions does not deprive the Court of the ability—or the obligation—to define claim scope at this stage of the case.

### III. LEGAL STANDARD FOR CLAIM CONSTRUCTION

Claim construction is a matter of law reserved exclusively for the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). The Court's task is to determine the meaning and scope of the asserted patent claims, which define the patentee's right to exclude. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). This inquiry is conducted from the perspective of a person of ordinary skill in the art ("POSITA") at the time of the invention, reading the claims in the context of the patent as a whole. *Id.*

The analysis begins with the claim language itself, which is the primary source of meaning. *Id.* at 1312. Claim terms are generally given their ordinary and customary meaning— that is, the meaning a POSITA would ascribe to the term in the context of the entire patent, including the surrounding claim language. *Id.* at 1313. Claim language must be read in context, not in isolation, and courts must consider how a POSITA would understand the terms when read in light of the patent's disclosure and purpose.

The specification is "always highly relevant" to claim construction and "is the single best guide to the meaning of a disputed term." *Id.* at 1315. While the claims define the scope of the

invention, the specification provides context, explains the problem addressed, and describes how the invention achieves its objectives. Courts therefore interpret claim terms consistently with the specification, but without importing limitations from specific embodiments, examples, or preferred implementations unless the patentee has clearly and unmistakably limited the claim scope. Id. at 1323.

The prosecution history is also intrinsic evidence and may inform the meaning of claim terms by demonstrating how the inventor and the Patent Office understood the invention. Id. at 1317. However, prosecution history disclaimer requires a "clear and unmistakable" surrender of claim scope; ambiguous statements or isolated remarks are insufficient. Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1324–26 (Fed. Cir. 2003). Absent such a disclaimer, claim terms retain their full ordinary meaning as understood in view of the intrinsic record.

Extrinsic evidence—including expert testimony, dictionaries, and technical literature—may be consulted but is inherently less reliable than the intrinsic record and cannot be used to contradict or vary the meaning established by the patent itself. Phillips, 415 F.3d at 1317–19. Where the intrinsic evidence resolves the meaning of a disputed term, reliance on extrinsic evidence is unnecessary and improper. Id.

Courts must also guard against constructions that improperly narrow claims by importing limitations from the specification or from particular embodiments. The Federal Circuit has repeatedly cautioned that "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." Id. at 1323. Claims are not limited to a preferred mode, manufacturing technique, installation method, or illustrative example unless the patentee has clearly chosen to do so. The absence of express claim language imposing such limitations confirms that broader scope was intended.

Assertions that claim terms require no construction or should be given their "plain and ordinary meaning" do not relieve the Court of its obligation to construe disputed terms where the scope of the claims is contested. Where a party disputes infringement or validity yet declines to articulate how claim terms should be understood, the Court must still construe the claims to define the legal boundaries of the patent rights at issue. Claim construction provides the framework against which infringement and validity must be assessed and cannot be deferred or avoided by conclusory denials.

Finally, the same claim construction governs both infringement and validity. Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1351 (Fed. Cir. 2001). Claim terms must therefore be construed consistently and based on the intrinsic record, not shaped by shifting litigation positions or outcome-driven considerations. Proper claim construction ensures that the parties' rights and obligations are evaluated on a stable, predictable, and legally sound foundation.

Nothing in Polylast's proposed constructions limits the asserted claims to a particular supplier, proprietary formulation, or manufacturing source. To the extent Defendants later contend that variations in implementation remove their products from the scope of the claims, such arguments go to infringement and not claim construction, and must be assessed under the claims as properly construed.

### IV. DISPUTED CLAIM TERMS AND PROPOSED CONSTRUCTIONS

### A.  U.S. Patent No. 9,982,143 ("'143 Patent)

The '143 Patent is directed to resilient rubber flooring systems designed to improve durability, structural integrity, performance under load, safety, and long-term resistance to degradation. The claims describe systems defined by their structural configuration and functional

interaction of components once deployed, rather than by any single material source, fabrication technique, or method of installation unless expressly stated in the claim language. The disputed terms addressed below appear in independent and dependent claims of the '143 Patent and are central to determining the scope of the patented invention.

Polylast proposes constructions grounded firmly in the intrinsic record, including the claim language, specification, and prosecution history of the '143 Patent. Each proposed construction reflects how a person of ordinary skill in the art would have understood the term at the time of the invention and gives effect to the full scope of the claim language without importing limitations from preferred embodiments or illustrative examples. Defendants have not proposed any competing constructions or otherwise articulated their position on the meaning of these terms.

Because the Court must construe disputed claim terms as a matter of law, and because Defendants have declined to participate in the claim-construction process, the Court should adopt Polylast's proposed constructions as consistent with the intrinsic evidence and governing Federal Circuit precedent.

The following claim terms from U.S. Patent No. 9,982,143 require construction. Polylast previously identified disputed claim terms pursuant to the Local Patent Rules and served proposed constructions grounded in the intrinsic record. Defendants did not propose any competing constructions or otherwise articulate their position as to the meaning of these terms. The Court must nevertheless construe the disputed terms as a matter of law. Polylast's proposed constructions reflect the ordinary and customary meaning of each term as understood by a person of ordinary skill in the art at the time of the invention, informed by the claim language, specification, and prosecution history.

| Claim Term | Polylast's Proposed Construction |
|---|---|
| **"sanitary surface composition"[1]** | A composition that forms a traffic-bearing surface or flooring system that, when applied, installed, placed, or otherwise provided and cured, reduces the presence of microbes and is suitable for human or animal traffic, including continuous surfaces, layered systems, topcoat layers, bulk flooring materials, pre-formed surface materials, mats, tiles, or combinations thereof. |
| **"flooring for human and animal traffic"** | A flooring surface or flooring system intended to support repeated movement or loading by humans, animals, or both, including indoor and outdoor flooring and traffic-bearing surfaces. |
| **"liquid binder"** | A flowable binding material capable of being applied, sprayed, poured, spread, or otherwise placed in liquid or semi-liquid form and that cures to form a solid or semi-solid matrix. |
| **"polyurethane"** | A polymeric material formed from the reaction of polyols and isocyanates, including materials that cure through chemical reaction or exposure to environmental conditions, including single-component and multi-component polyurethanes. |

---

[1] The claims do not require the surface composition to be porous, and encompass both porous and non-porous implementations, including use as a surface layer, topcoat, or as part of – or constituting – the entire flooring system, whether applied alone or in combination with underlying materials, and whether cured, partially cured, or fully cured prior to or during placement. i

| Claim Term | Polylast's Proposed Construction |
|---|---|
| "adapted to cure through an exothermic reaction process"[2] | Configured to cure by a chemical reaction that generates heat during curing, without requiring a particular temperature profile, heat magnitude, or curing duration. |
| "exothermic reaction process" | A curing reaction that releases heat as the liquid binder transitions to a cured state. |
| "cured liquid binder has an increased viscosity relative to the liquid binder prior to curing" | The binder transitions from a lower-viscosity liquid state to a higher-viscosity or solid state as curing progresses. |
| "primer" | A material or layer applied or present to promote adhesion between components of the surface composition and an underlying surface, whether applied as a separate layer or integrated into another component. |
| "adapted to adhere to the cured liquid binder" | Configured to bond or attach to the cured binder under normal use conditions. |
| "effective amount of an antimicrobial composition" | An amount sufficient to inhibit, reduce, suppress, or prevent microbial growth during use of the surface, without requiring complete elimination of microbes or a specific concentration. |

---

[2] Where the claims recite components "comprising" particular materials, the term "comprising" is used in its open-ended sense and does not exclude additional components consistent with the claimed structure and function.

| Claim Term | Polylast's Proposed Construction |
|---|---|
| "antimicrobial composition" | A composition that inhibits, reduces, suppresses, or prevents the growth or viability of microorganisms. |
| "adapted to retain antimicrobial activity through the exothermic reaction process" | Configured to maintain antimicrobial functionality despite exposure to heat generated during curing. |
| "surface composition applied to the roadway void and the flooring" | The surface composition placed on, within, over, or forming the flooring or roadway void, whether as a coating, layer, bulk material, or integral flooring structure. |
| "adapted to withstand wear from the traffic" | Capable of maintaining structural integrity and function under repeated loading, abrasion, or contact from human or animal movement. |
| "filler material" | A material combined with the liquid binder to modify physical, mechanical, or surface properties of the cured composition, including particulate or granular materials such as aggregate, rubber particles, asphalt particles, sand, ceramics, glass, marble, rock, gravel, and other mineral or synthetic fillers consistent with the claimed structure and function. |
| "mixed with the liquid binder" | Combined with the binder prior to or during application, without requiring a particular order, ratio, or method of mixing. |

| Claim Term | Polylast's Proposed Construction |
|---|---|
| "adapted to provide slip resistance" | Configured to increase friction or reduce slipping during use. |
| "aggregate material" | A particulate or granular material used as a filler. |
| "rubber particles" | Discrete pieces of rubber material, whether natural or synthetic. |
| "first component comprising a polyol"[3] | A binder component containing a polyol prior to curing. |
| "second component comprising an isocyanate" | A binder component containing an isocyanate prior to curing. |
| "isocyanate" | A compound containing isocyanate functional groups capable of reacting to form polyurethane. |
| "mixing of the first component and the second component" | Combining the polyol-containing component and the isocyanate-containing component. |
| "exposure of the liquid binder to air" | Contact with ambient atmospheric conditions sufficient to initiate or contribute to curing. |
| "additive" | A component added to modify properties of the surface composition. |
| "surfactant" | An additive that modifies surface tension or wetting behavior. |
| "pigment" | An additive that provides color or visual appearance. |

---

[3] Where the claims recite components "comprising" particular materials, the term "comprising" is used in its open-ended sense and does not exclude additional components consistent with the claimed structure and function.

| Claim Term | Polylast's Proposed Construction |
|---|---|
| "edge retention composition" | An additive configured to maintain edge definition or surface integrity at boundaries. |
| "antifungal composition" | An antimicrobial composition effective against fungi. |
| "antiviral composition" | An antimicrobial composition effective against viruses. |
| "antiprotozoal composition" | An antimicrobial composition effective against protozoa. |
| "antibacterial composition" | An antimicrobial composition effective against bacteria. |
| "triclosan" | The antimicrobial compound triclosan. |
| "metal oxide" | An inorganic oxide of a metal used for antimicrobial properties. |
| "present throughout the surface composition" | Distributed within the surface composition such that antimicrobial functionality remains available throughout the thickness or functional regions of the surface, including areas exposed by wear, scratches, or cracks. |
| "scratches or cracks" | Surface discontinuities formed during use or wear. |
| "method for forming a safety flooring" | A series of steps performed to create, manufacture, and install a traffic-bearing flooring surface, including, without limitation, flooring with antimicrobial additives. |
| "mixing" | Combining components, without limitation to technique or sequence. |

| Claim Term | Polylast's Proposed Construction |
|---|---|
| **"applying" / "applied"** | Placing, depositing, positioning, adhering, spreading, pouring, spraying, broadcasting, layering, or otherwise providing the surface composition or its components onto a surface, whether formed in situ, partially cured prior to placement, uncured at placement, or fully cured prior to placement, and regardless of whether done in a single step or multiple steps. |
| **"allowing a sufficient amount of time for the liquid binder to cure"** | Permitting curing to occur until the surface is suitable for traffic, without requiring a specific duration or curing condition. |
| **"spraying the surface of the liquid binder with a catalyst"** | Applying a catalyst to the binder surface by spraying, without limiting spray equipment or method. |
| **"absorbs to the liquid binder"** | Becomes attached to or retained by the binder prior to curing. |
| **"surface"** | A boundary, layer, or exposed region of a flooring or flooring system configured to receive traffic, whether planar, textured, contoured, or irregular. |
| **"traffic"** | Movement, loading, abrasion, or contact caused by humans, animals, equipment, or objects during intended use. |

| Claim Term | Polylast's Proposed Construction |
|---|---|
| **"withstand wear"** | Maintain functional integrity, adhesion, and antimicrobial performance under repeated traffic without requiring the absence of visible wear. |

### B.  U.S. Patent No. 10,309,070 ("'070 Patent)

The '070 Patent is directed to resilient rubber bunker liner and related rubber-based systems designed to improve durability, drainage performance, load distribution, and long-term resistance to environmental and mechanical degradation. The claims describe systems defined by their structural configuration and functional interaction of components once deployed or installed, including embodiments formed or assembled prior to installation as well as systems implemented at the site of use, rather than by any particular material source, fabrication technique, or installation method unless expressly stated in the claim language. The disputed terms addressed below appear in independent and dependent claims of the '070 Patent and are central to determining the scope of the patented invention.

Polylast proposes constructions grounded firmly in the intrinsic record, including the claim language, specification, and prosecution history of the '070 Patent. Each proposed construction reflects how a person of ordinary skill in the art would have understood the term at the time of the invention and gives effect to the full scope of the claim language without importing limitations from preferred embodiments, illustrative examples, or specific implementations. Defendants have not proposed any competing constructions or otherwise articulated their position on the meaning of these terms.

Because the Court must construe disputed claim terms as a matter of law, and because Defendants have declined to participate in the claim-construction process, the Court should adopt Polylast's proposed constructions as consistent with the intrinsic evidence and governing Federal Circuit precedent.

The following claim terms from U.S. Patent No. 10,309,070 require construction. Polylast previously identified disputed claim terms pursuant to the Local Patent Rules and served proposed constructions grounded in the intrinsic record. Defendants did not propose any competing constructions or otherwise articulate their position as to the meaning of these terms. The Court must nevertheless construe the disputed terms as a matter of law. Polylast's proposed constructions reflect the ordinary and customary meaning of each term as understood by a person of ordinary skill in the art at the time of the invention, informed by the claim language, specification, and prosecution history.

| Claim Term[4] | Polylast's Proposed Construction |
|---|---|
| **"cured flexible bunker liner"** | A bunker liner that has completed curing to form a finished product exhibiting flexibility sufficient to bend, contour, conform, or adapt to bunker geometry without fracture, cracking, or structural failure. |
| **"preformed flexible bunker liner"** | A bunker liner formed into its final shape prior to placement in the bunker, which may be further adapted or conformed during installation. |

---

[4] The phrase "consisting of" limits the cured flexible bunker liner to the recited components, but does not exclude additional properties, internal features, surface characteristics, textures, geometries, or configurations inherent in or resulting from those components, so long as no additional components are added.

| Claim Term[4] | Polylast's Proposed Construction |
|---|---|
| **"liquid coating composition"** | A flowable composition in liquid form applied to particulate material prior to curing to coat, wet, or condition the particulate material. |
| **"polyol"** | A compound containing multiple hydroxyl (–OH) groups capable of reacting to form polyurethane. |
| **"particulate material comprising rubber particles"[5]** | A particulate material that includes rubber particles, and may additionally include other particulate components, fillers, or materials, provided the particulate material satisfies the structural and functional requirements recited in the claim. |
| **"coated particulate material"** | A particulate material, including rubber particles and any additional particulate components, having the liquid coating composition applied to at least a portion of the particle surfaces. |
| **"porous structure"** | A structure containing interconnected voids or passages formed by the particulate material and binder, permitting fluid flow through the structure. |
| **"pore diameter suitable to allow moisture to travel through the** | A pore size or pore arrangement or structure selected to permit the passage of moisture while resisting or limiting |

---

[5] Where the claims recite particulate material "comprising rubber particles," the term "comprising" is used in its open-ended sense, requiring the presence of rubber particles without excluding additional particulate components consistent with the claimed structure and function.

| Claim Term[4] | Polylast's Proposed Construction |
|---|---|
| **bunker liner and prevent particulate matter from traveling through the bunker liner"** | the migration or passage of particulate matter, without requiring a specific numerical pore dimension or excluding incidental passage consistent with the liner's intended function. |
| **"flexible structure configured to substantially conform to the contours of the golf course bunker"[67]** | A structure capable of bending, adapting, molding, or flexing so as to follow, conform to, or match the contours of the bunker surface, including irregular, contoured, textured, or non-planar surfaces. |
| **"stable structure that retains the shape of the golf course bunker according to the native turf underlying the bunker"** | A structure that, once positioned, maintains the bunker's contours over time as defined by the underlying native turf, while permitting flexibility sufficient to conform during placement. |
| **"liquid binder comprising a moisture curing polyurethane based prepolymer"** | A liquid binder containing a polyurethane-based prepolymer that cures through exposure to moisture to form a polymer network. |
| **"moisture curing"** | Capable of curing through reaction with ambient, environmental, or introduced moisture. |

---

[6] Functional claim language describes capability or configuration, not a requirement of perfect or absolute performance under all conditions.
[7] The term "substantially" is used in its customary engineering sense to allow for reasonable variation consistent with real-world conditions and does not require mathematical precision.

| Claim Term[4] | Polylast's Proposed Construction |
|---|---|
| **"polyurethane based prepolymer"** | A partially reacted polyurethane material containing reactive functional groups capable of further curing or crosslinking to form a polyurethane polymer. |
| **"cured into a preselected molded shape"** | Cured into a shape selected prior to curing, including shapes formed using molds, forms, supports, or other defining structures. |
| **"preselected molded shape"** | A shape selected before curing, without limitation to the method by which the shape is created. |
| **"stabilizing ridges"** | Raised, recessed, textured, or contoured structural features formed in the bunker liner, including irregular, non-planar, textured, contoured, or discontinuous geometry, configured to resist movement, enhance stability, or promote drainage or flow-through. |
| **"turned-down edge"** | A peripheral region of the bunker liner that extends downward or transitions in a downward direction, including through contoured, textured, irregular, tapered, angled, curved, or non-planar geometry, whether continuous or discontinuous. |
| **"overlays the native turf" / "application over native turf"** | Positioned on top of, in contact with, or covering the native turf. |

| Claim Term[4] | Polylast's Proposed Construction |
|---|---|
| "not affixed to the native turf" / "not affixed" | Installed without permanent fastening, bonding, or mechanical attachment to the native turf. |
| "thickness of at least approximately ⅜ inches" | A thickness equal to or greater than about ⅜ inches, allowing for ordinary manufacturing tolerances. |
| "between approximately ⅜ and approximately ½ inches" | A thickness within that range, allowing for ordinary manufacturing tolerances. |
| "antimicrobial composition" | A composition that inhibits, reduces, or suppresses microbial growth. |
| "mixed with the liquid binder and the particulate material prior to curing" | Combined with the liquid binder and particulate material before curing occurs. |
| "method of making" | A sequence of steps performed to produce the claimed bunker liner. |
| "pouring the mixture … into a mold"[8] | Introducing the mixture into a mold, form, or shaping structure, without limiting the manner of introduction. |
| "allowing the mixture … to cure" | Permitting curing to occur, without requiring a specific duration, environment, or curing mechanism. |
| "positioning the cured flexible bunker liner" | Placing, arranging, or laying the cured liner into the bunker in a desired location, orientation, or manner. |

---

[8] Claim language reciting pouring into a mold or curing in a mold does not limit the manner of introduction, orientation, or tooling used, absent express language to the contrary.

| Claim Term[4] | Polylast's Proposed Construction |
|---|---|
| **"mold"** | A structure, form, mold, or shaping tool or mechanism used to define the shape or surface features of the bunker liner during curing. |

## V. EXPLANATORY NOTES FOR SELECTED KEY CLAIM TERMS

Although Polylast has proposed constructions for all disputed claim terms in the charts above, the following explanatory notes address a limited subset of key terms whose proper construction is particularly important to defining the scope of the asserted claims. These explanations are grounded exclusively in the intrinsic record and are offered to assist the Court in understanding how a person of ordinary skill in the art would have understood these terms at the time of the invention. Polylast does not repeat its proposed constructions verbatim here, but instead explains why those constructions properly reflect the claim language, specifications, and prosecution histories of the asserted patents.

As a threshold matter, nothing in the asserted claims of either patent limits the claimed systems or compositions to being formed exclusively in situ, poured in place, sprayed, or applied in any single manufacturing or installation sequence. Where the claims describe functional characteristics of the cured product or applied surface, a person of ordinary skill in the art would understand those claims to encompass products that are pre-formed, partially cured, fully cured, or uncured at the time of placement, unless a particular claim expressly provides otherwise.

Nothing in these explanatory notes narrows Polylast's proposed constructions or disclaims any claim scope reflected in the charts above; they are provided solely to clarify how a

person of ordinary skill in the art would understand the claim language in view of the intrinsic record.

Defendants' reliance on factual assertions about their products—rather than on claim language or intrinsic evidence—underscores the need for the Court's intervention. Having declined to articulate claim-scope positions at the appropriate time, Defendants should not, consistent with fairness and orderly process, be permitted to later advance constructions tailored to avoid infringement or to challenge validity. Claim construction must be grounded in the intrinsic record, not reshaped through shifting product-specific arguments.

A. "Cured Flexible Bunker Liner" ('070 Patent)

The claims of the '070 Patent are directed to a "cured flexible bunker liner" defined by its functional performance once formed, not by a particular method of manufacture, installation sequence, or geometric regularity. The intrinsic record consistently emphasizes flexibility, drainage capability, and structural stability when deployed in a golf course bunker environment.

Nothing in the claim language or specification limits the bunker liner to a planar structure, a uniform surface, or a traditional edge geometry. To the contrary, the claims expressly contemplate preselected molded shapes, stabilizing ridges, and structures configured to conform to irregular bunker contours. A person of ordinary skill in the art would therefore understand the term to encompass liners that are contoured, textured, irregular, non-planar, or rock-like in geometry, provided the claimed functional requirements are met.

B. "Turned-Down Edge" ('070 Patent)

The claims recite a "turned-down edge" as an optional feature of certain preselected molded shapes. The intrinsic record does not define this term narrowly or require a sharp, linear,

or uniform edge. Nor does it require a distinct boundary between a flat surface and an edge region.

Consistent with the purpose of the invention—stabilization, retention, and conformity within a bunker—a person of ordinary skill in the art would understand a "turned-down edge" to include any peripheral region that transitions downward, including through contoured, textured, tapered, angled, curved, irregular, or non-planar geometry. The term does not require a smooth or discrete transition and does not exclude embodiments where the liner surface is continuously contoured across its entire extent.

### C. "Particulate Material Comprising Rubber Particles" ('070 Patent)

The claims expressly use the term "comprising" when describing particulate material that includes rubber particles. As used in patent law, "comprising" is an open-ended transitional term that requires the presence of the recited element without excluding additional components.

Accordingly, a person of ordinary skill in the art would understand that while rubber particles must be present, the particulate material may also include other particulate components, fillers, or materials consistent with the claimed porous structure, flexibility, drainage, and stability. Nothing in the intrinsic record suggests an intent to limit the particulate material to rubber alone or to exclude additional particulate constituents that do not undermine the claimed structure or function.

### D. "Porous Structure" and "Pore Diameter Suitable to Allow Moisture to Travel Through" ('070 Patent)

The '070 Patent uses functional language to describe porosity and pore size. The claims do not recite numerical pore dimensions, percentages, or rigid thresholds. Instead, pore

characteristics are defined by performance: allowing moisture to travel through the liner while preventing migration of particulate matter.

A person of ordinary skill in the art would understand these terms to describe a functional balance, not an absolute or mathematically precise condition. The intrinsic record does not require perfect exclusion of all particulate matter or uninterrupted fluid flow under all conditions. Minor or incidental passage consistent with real-world use does not fall outside the scope of the claims.

E. "Sanitary Surface Composition" ('143 Patent)

The '143 Patent is directed to a "sanitary surface composition" for flooring that reduces the presence of microbes while withstanding traffic. The claims do not limit the composition to a particular thickness, porosity, or method of deployment. Nor do they require that the composition be applied only as a thin coating or only in situ. The claims do not require the surface composition to be porous, and encompass both porous and non-porous implementations, including continuous, non-porous topcoat layers applied alone or as part of a larger flooring system. Nothing in the claim language limits the surface composition to a particular thickness, layer count, or position within a flooring system.

Instead, the intrinsic record supports a construction that encompasses entire flooring systems and traffic-bearing structures, including bulk flooring materials, layered systems, continuous surfaces, topcoat layers, integrated flooring assemblies, and combinations thereof. The claims also encompass compositions that are poured in place, sprayed, applied in layers, pre-formed, partially cured prior to placement, fully cured prior to placement, or uncured at the time of application.

F. "Liquid Binder Comprising a Polyurethane Adapted to Cure Through an Exothermic
Reaction Process" ('143 Patent)

The claims define the binder by how it cures, not by a specific formulation or number of
components. The intrinsic record makes clear that curing may be initiated by mixing
components, exposure to air, application of a catalyst, or combinations thereof. The claim
language focuses on the functional outcome of curing, rather than prescribing a single exclusive
mechanism. The claims do not require exclusivity as to the curing trigger, and do not exclude
curing processes that involve multiple simultaneous or sequential mechanisms.

A person of ordinary skill in the art would therefore understand the term to encompass
single-component and multi-component polyurethanes, including moisture-curable systems and
systems initiated by chemical mixing, provided the curing process is exothermic and results in
increased viscosity or solidification as claimed.

G. "Filler Material" ('143 Patent)

The '143 Patent explicitly lists examples of filler materials, including aggregate material,
rubber particles, asphalt particles, sand, ceramics, glass, marble, rock, and gravel particles. The
claims do not restrict filler materials to a single category or exclude combinations of different
fillers.

Consistent with the intrinsic record, a person of ordinary skill in the art would understand
"filler material" broadly to include particulate or granular materials used to modify mechanical,
surface, or functional properties of the cured composition, including slip resistance,
compressibility, durability, and wear resistance.

H. "Antimicrobial" and "Antimicrobial Composition" ('143 Patent)

The claims repeatedly emphasize functional antimicrobial performance, not total sterilization or permanent eradication. The intrinsic record does not require complete elimination of all microbes, nor does it limit antimicrobial activity to a single mechanism or compound.

A person of ordinary skill in the art would therefore understand "antimicrobial" and "antimicrobial composition" to mean capable of inhibiting, reducing, suppressing, or preventing microbial growth or viability, including within scratches or cracks formed during use, without requiring absolute microbial elimination.

I. "Applying" and "Applied" ('143 Patent)

The method claims use broad language describing application of the surface composition. The intrinsic record does not restrict application to pouring, spraying, or any single technique.

Consistent with the claims and specification, these terms encompass placing, depositing, spreading, spraying, pouring, broadcasting, layering, or otherwise providing the surface composition or its components onto a surface, whether the surface composition is formed in situ, partially cured prior to placement, uncured prior to placement, fully cured prior to placement, and regardless of whether done in a single step or multiple steps, and regardless of whether the surface composition or its components are supplied as a unitary system or assembled from multiple components at different times.

Read as a whole, the asserted claims describe systems and compositions defined by what they are and how they perform once deployed, not by rigid manufacturing steps, geometric regularity, or installation formalities.

## VI. EFFECT OF DEFENDANTS' FAILURE TO PARTICIPATE IN CLAIM CONSTRUCTION

The Local Patent Rules and this Court's Scheduling Order are designed to require early, substantive engagement in claim construction so that disputes over claim scope may be resolved efficiently, fairly, and on a sufficient record. Claim construction is not optional. It is a mandatory step in patent litigation that defines the scope of the parties' rights and obligations and governs both infringement and validity. Polylast complied in good faith with those requirements.

Polylast identified disputed claim terms and submitted this opening claim-construction brief in accordance with the Court's Scheduling Order. Polylast's constructions are supported by the claim language, the specifications, and the prosecution histories of the '070 and '143 Patents and reflect how a person of ordinary skill in the art would have understood the claims at the time of the invention.

Defendants, by contrast, declined to participate in the claim-construction process. They did not identify any claim terms requiring construction, did not propose any constructions, and did not respond to Polylast's proposed constructions. Defendants' assertion that "no claim construction is necessary" does not resolve the meaning or scope of the asserted claims and does not relieve the Court of its obligation to construe disputed claim terms as a matter of law. Nor does it excuse Defendants from complying with the procedural framework governing claim construction.

A party's decision not to advance claim-construction positions is a litigation choice that carries consequences. Courts routinely hold that where one party presents proposed constructions supported by the intrinsic record and the opposing party elects not to do so, the court may resolve claim scope based on the constructions properly presented. Allowing a party to withhold its

29

claim-construction positions at this stage, only to introduce new or shifting interpretations later in the case, would undermine the purpose of early claim construction, frustrate the Local Patent Rules, and prejudice the orderly resolution of the litigation.

The purpose of early claim construction is to fix the meaning of disputed claim terms before the parties and the Court expend substantial resources on discovery, expert analysis, and dispositive motions. That purpose would be defeated if Defendants were permitted to reserve undisclosed claim-construction theories for later phases of the case, after Polylast has disclosed its infringement theories, produced discovery, or presented expert opinions based on the constructions properly served under the Patent Rules.

The Court has sufficient intrinsic record on which to construe the disputed claim terms presented here. Polylast has identified the disputed terms, proposed constructions grounded in the intrinsic evidence, and explained the basis for those constructions. Defendants have identified no intrinsic evidence contradicting Polylast's constructions and have articulated no alternative interpretations for the Court to consider. Because the same constructions govern both infringement and validity, Defendants' decision not to articulate claim-scope positions during the claim-construction process should not permit them to later advance new or inconsistent constructions for validity or any other purpose. Under these circumstances, adoption of Polylast's proposed constructions is not only appropriate, but necessary to ensure that the case proceeds on a clear and stable understanding of claim scope.

Defendants' failure to participate should not operate to delay claim construction, create uncertainty regarding claim scope, or permit later attempts to reshape the meaning of the claims through merits arguments untethered from the intrinsic record. Rather, it reinforces the need for

the Court to construe the asserted claims now, based on the record properly before it, and to apply those constructions consistently throughout the remainder of the case.

For these reasons, the Court should construe the disputed claim terms in accordance with Polylast's proposed constructions and proceed with the case on that settled understanding of claim scope.

## VII. CONCLUSION

Claim construction is a foundational step in this litigation. It defines the scope of the parties' rights, governs both infringement and validity, and ensures that the case proceeds on a shared and stable understanding of the asserted patents. Polylast has complied in good faith with the Local Patent Rules and the Court's Scheduling Order by identifying disputed claim terms, proposing constructions grounded in the intrinsic record, and presenting a principled analysis of claim scope for the Court's consideration.

The intrinsic evidence—the claim language, specifications, and prosecution histories of U.S. Patent Nos. 10,309,070 and 9,982,143—supports Polylast's proposed constructions. Those constructions reflect the ordinary and customary meaning of the disputed terms as understood by a person of ordinary skill in the art at the time of the invention, give effect to the full scope of the claims, and avoid importing limitations from preferred embodiments or illustrative examples absent any clear and unmistakable disclaimer.

Defendants elected not to participate in the claim-construction process. They did not identify disputed terms, did not propose alternative constructions, and did not point to any intrinsic evidence that would warrant a different interpretation of the claims. As a result, the Court has before it a substantive and unrebutted claim-construction record. Proceeding on that

record promotes fairness, judicial efficiency, and adherence to the procedural framework governing patent cases.

Adopting Polylast's proposed constructions will provide the clarity necessary for the orderly resolution of this case, ensure that infringement and validity are evaluated under consistent legal standards, and prevent uncertainty or shifting interpretations as the case advances. Under these circumstances, and consistent with governing Federal Circuit precedent, the Court should construe the disputed claim terms in accordance with Polylast's proposed constructions.

Accordingly, Polylast respectfully requests that the Court adopt its proposed claim constructions for the '070 and '143 Patents.

Dated: December 15, 2025

                  Respectfully submitted,

                  LEMICK LAW, LTD.
                  2460 Dundee Rd., Suite 474
                  Northbrook, IL 60065
                  847/409-3988
                  tlemick@lemicklaw.com

                  By: __/s/ Taylor Lemick_____
                  Taylor Lemick
                  State Bar No. 6327224
                  With local counsel:
                  Gossett, Harrison, Millican & Stipanovic, P.C.
                  Paul D. Stipanovic
                  State Bar No. 00795669

                  COUNSEL FOR PLAINTIFF, POLYLAST
                  SYSTEMS, LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of December 2025, a true and correct copy of the foregoing was filed with the Court via its CM/ECF System, which will send notification of such filing to all counsel of record who have appeared in this action.

<u>\s\   Taylor Lemick</u>
Taylor Lemick